

ENTERED
06/26/2007

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BENNET WAYNE BLOW | § | |
|     DEBTOR(S) | § | CASE NO. 05-91802-H5-7 |
| | § | |
| JANET CASCIATO-NORTHRUP, | § | |
| TRUSTEE, ET AL., | § | |
|     PLAINTIFF(S) | § | ADVERSARY NO. 06-3358 |
| | § | |
| VS. | § | |
| | § | |
| BENNET WAYNE BLOW | § | |
|     DEFENDANT(S) | § | |

## MEMORANDUM OPINION

Before the Court is the Complaint of Janet Casciato-Northrup, Trustee to deny debtor's discharge under 11 U.S.C. § 727(a)(2), (a)(4)(A) and (a)(4)(D); or, alternatively, to revoke the debtor's discharge under § 727(d)[1].

On October 14, 2005, Bennet W. Blow filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code. At the time of filing bankruptcy, debtor was

---

[1] The deadline to oppose debtor's discharge was February 27, 2006, which the Court extended to April 28, 2006, for the trustee and the United States trustee only. Amegy Bank filed a motion to extend time and a complaint objecting to debtor's discharge and to determine the dischargeability of its debt on February 28, 2006. The Court initially granted Amegy Bank's motion to extend time, but, upon debtor's motion to reconsider, the Court denied the extension and dismissed Amegy Bank's complaint. Despite the untimeliness of Amegy Bank's complaint, the Court allowed counsel for Amegy Bank to participate in trial of the trustee's case. Debtor has not been issued an order of discharge, therefore the Court need not consider revocation of the discharge order.

the owner of five businesses, Atkins, Harris & Brown, L.L.C., BCS Global Holdings, Ltd., Atkins, Harris & Brown, Inc., Retail Collection Services, and Commercial Investigations, L.L.C. The companies had ceased operations in August 2005, and the co-owner of the businesses, Steven Guignard, had transferred his interest in the companies to debtor. At the time of filing, debtor was winding down the affairs of the corporations, moving and storing most of the business equipment and records in a storage facility. Debtor kept one company computer at his home. In debtor's schedules and statement of affairs, filed with his bankruptcy petition, debtor stated, under penalty of perjury, that he did not own any stocks or other interests in any businesses, owned no office equipment, and did not hold or control any property for any one else.

At the time of filing, one of debtor's companies, Atkins, Harris & Brown, L.L.C., had a lawsuit pending against Reliant Energy Retail, Inc. n/k/a Center Point Energy Gas Services, Inc., cause no. 2004-18467, in the 234th Judicial District Court of Harris County, Texas. On December 15, 2005, debtor executed a settlement agreement on behalf of Atkins, Harris & Brown, L.L.C. and on December 28, 2005, debtor received a check in the amount of $30,000, payable to Atkins, Harris & Brown L.L.C. representing proceeds of the settlement. Debtor did not cash that check and on March 22, 2006, had it reissued as payable to Atkins, Harris & Brown L.L.C. and

Robert W. Roberts, an attorney for the company. Debtor instructed Roberts to retain $9,000, and to send the remaining $21,000 to the IRS for payment of debtor's personal tax debt.

At the time of filing bankruptcy, debtor owned the licenses for four club seats at Reliant Stadium. Debtor bought the permanent seat license and club seat license for 2 of the club seats directly from Harris County - Houston Sports Authority on May 7, 2002, at an initial cost of $4,200. Debtor obtained 2 additional club seats on January 28, 2004, as assignee of another initial licensee, Raymond Charles Rae. The initial annual license fee was $2,575 per club seat, subject to increases described in the license agreement. On July 17, 2005, debtor received his 2005-2006 Houston Texans season tickets and parking passes. In addition to debtor's four club seat licenses, Steven Guignard owned two club seat licenses. A dispute arose in August 2005, between debtor and Steven Guignard concerning payment for Guignard's club seat tickets for the 2005-2006 season. Payment for the tickets had been charged to debtor's American Express card, but debtor disputed the payment. Consequently, the Texans canceled the credit card payment and deactivated Guignard's tickets so that they were no longer valid. Debtor's American Express statement dated August 22, 2005, shows a credit of $5,585.00 from the Houston Texans dated August 14, 2005, and a credit pending investigation dated August 22, 2005, in the amount of

$15,079.50. A letter from the Texans to debtor dated April 17, 2006, shows that the Texans still expected payment for debtor's four club seats. Debtor's four tickets were never deactivated. Debtor did not disclose his license or tickets in his schedules and statement of affairs, did not show that he held them for any one else, and did not show that he had returned them to the seller.

At the time of filing, debtor was a signatory on two checking accounts at Amegy Bank, debtor had a term life insurance policy, and debtor's wife had obtained a job at Baylor College of Medicine beginning September 2005 earning between $32,000 and $53,000 annually.[2] In addition, debtor's daughter had begun college at Baylor University. To pay tuition, debtor had co-signed a $43,000 loan to Sallie Mae. On his schedules and statement of affairs, debtor did not disclose his financial accounts or show they were closed. He did not disclose his spouse's income or his student loan debt.

Debtor's meeting of creditors was conducted on December 27, 2005. After being sworn to tell the truth, debtor affirmed that he had reviewed his schedules and statement of affairs before signing them, that he had understood them and that he had

---

[2]Debtor's spouse's earning statement for January 13, 2006 reflects earnings at an hourly rate of $15.38 per 80 hours, the equivalent of $31,990 annually, but debtor's counsel's letter to the trustee dated January 11, 2006, states that debtor's spouse earned $17,818 in the four months from September 2005 through December 2005, the equivalent of $53,000 annually, and debtor testified in his deposition taken April 18, 2006, that she earned $35,000 to $40,000 annually.

verified their accuracy. When questioned about specific answers on his schedules and statement of affairs, debtor began making excuses for his inaccurate answers. When asked whether he had any bank accounts, debtor testified that he did have an account. When informed that his schedules show "none" where the account should have been listed, debtor testified that he had "assumed" his account had been listed, and later, that the account had less than $100 on deposit. When asked whether he had scheduled all creditors, debtor testified that he had, but debtor knew that he had not scheduled the student loan with Sallie Mae.

During the creditors meeting, debtor testified ambiguously concerning his ownership interests in Atkins, Harris & Brown, L.L.C., BCS Global Holdings, Ltd., Atkins, Harris & Brown, Inc., Retail Collection Services, and Commercial Investigations, L.L.C., stating that he owned either 51% or 100% of the companies. Debtor further testified that the companies had no value. However, the evidence shows he had, just twelve days prior, executed a settlement agreement for Atkins, Harris & Brown, L.L.C., resulting, three days after the meeting, in his receipt of $30,000, from which he personally received $21,000. When questioned at the meeting about his spouse's assets, debtor admitted that he had not scheduled his spouse's vehicle which was acquired during the couple's marriage and that his wife's

employment income, which he had scheduled as "$0.00" was paying the couple's mortgage payments.

During the creditor's meeting, the trustee asked debtor to provide the following items within 15 days: (1) amendments to schedules B and J listing all interests in corporations, all bank accounts on which debtor has had signing authority for the last 12 months, debtor's spouse's Jeep and her current income; (2) individual and corporate tax returns for 2 years and balance sheets for all companies; (3) documents evidencing the transfer of Alliance Recovery, Inc.; (4) verification of debtors income for last year; and (5) bank statements. Debtor's counsel began attempting to collect the documents and data from debtor soon after the conclusion of the creditor's meeting. By letter dated January 11, 2006, debtor's counsel forwarded to the trustee bank statements, personal and business tax returns, and information concerning debtor's and debtor's spouse's incomes and debtor's spouse's vehicle. Debtor failed to provide sufficient information to amend his schedules and statement of affairs, however, despite repeated prompting via email and letters from his counsel from January 9, 2006, through May 18, 2006.

The trustee took debtor's deposition on April 18, 2006. The transcript of debtor's deposition of April 18, 2006, given under oath and entered into the record at trial, shows that debtor responded to questions in an evasive manner. For instance,

when asked about the use of the settlement proceeds from the Reliant litigation, debtor testified that Atkins, Harris & Brown's used the settlement proceeds to pay attorney's fees and taxes. Only when pressed about the matter did debtor reveal that the funds were used to pay his personal taxes.

Further, in his deposition, when asked repeatedly for contact information for attorney Robert Roberts, debtor testified that he did not know where the attorney's office was located and that he would have to look up the attorney's cell phone number. When asked whether the number was current, debtor responded, "As far as I know." A few minutes later, when asked, "When was the last time you spoke to Mr. Robert Roberts," debtor responded, "Two minutes ago or right before– right at lunch."

In his deposition, debtor untruthfully responded to inquiries concerning the Houston Texan tickets. Debtor testified that he did not own any Houston Texan football tickets, then, that the tickets were owned by BCS, but were in the names of debtor, Steven Guignard, and Charlie Rae. When asked where the tickets are delivered, debtor testified that the tickets are mailed to the company office, but a letter from the Texans dated July 17, 2005, shows that debtor's tickets for the 2005-2006 season were mailed to him at his home address.

The trustee filed her complaint objecting to debtor's discharge on April 26, 2006. The debtor filed amended schedules and an amended statement of affairs on August 2, 2006. On August 11, 2006, the debtor filed an amended Schedule B and an amended statement of affairs.

On August 15, 2006, debtor signed a sworn affidavit in connection with his case, wherein he states that he never provided his attorney with information concerning his ownership of his four corporations and the general partnership because "they already had that information." Debtor states in his affidavit that he questioned his attorney's secretary about omissions from his schedules. Debtor does not state that he ever questioned his attorney about omissions from his schedules, but does blame his attorney for the deficiencies in his schedules. At trial, debtor testified that he had provided all pertinent information to his counsel and that his attorney had failed to schedule the assets. On August 31, 2006, the debtor filed an amended Schedule C.

Bankruptcy Code, 11 U.S.C. § 727(a)(2), (a)(4)(A) and (a)(4)(D) provides:

(a) The court shall grant the debtor a discharge, unless--

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

>> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition;
>
> . . . .
>
>> (4) the debtor knowingly and fraudulently, in or in connection with the case--
>
> (A) made a false oath or account . . .
>
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs . . .

11 U.S.C. § 727.

Under 11 U.S.C. § 727(a)(4)(a), the plaintiff has the burden of proving that: (1) debtor made a statement under oath; (2) the statement was false; (3) debtor knew the statement was false; (4) debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. In re Beaubouef, 966 F.2d 174 (5th Cir. 1992). "False oaths sufficient to justify the denial of discharge include '(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings.'" Id. at 178 (citing 4 Collier on Bankruptcy ¶ 727.04[1], at 727-59 (15th ed. 1992).) As a matter of law, reliance on advice of counsel is no defense to an action under 11 U.S.C. 727(a)(4)(A) where debtor has knowingly sworn to false information. In re Sholdra, 249 F.3d 380, 383 (5th Cir.2001) (". . . inexperience with financial affairs or reliance

on incorrect advice or information, even if true, cannot withstand summary judgment.")

Debtor has testified that he gave his attorney all pertinent information to complete his schedules or that his attorney "already had" the required information. Debtor has testified that the inaccuracies in his schedules and statement of affairs were caused by his counsel because he had relied on counsel's advice and had assumed counsel had properly scheduled his assets. Debtor has not explained, however, how his reliance on his counsel's advice caused him to repeatedly fail to tell the truth under oath in response to simple questions during his meeting of creditors and at his deposition. The Court finds that debtor's testimony is not credible.

The Court finds that debtor knowingly and fraudulently withheld from the trustee information concerning his interests in and the value of his businesses, his personal use of the Reliant settlement proceeds, his bank accounts, and his Houston Texan license and tickets. Debtor concealed his personal interest in the Reliant settlement proceeds and his Houston Texan tickets to hinder, delay or defraud his creditors. Debtor knowingly and fraudulently under penalty of perjury filed schedules and a statement of affairs which failed to disclose all of his property and debts and testified under oath at his creditor's meeting and in deposition in a manner intended to evade disclosure of his assets and to mislead the trustee and creditors.

Based on the foregoing, it is

**ORDERED** that debtor's discharge is **DENIED**.

Signed this 25th day of June, 2007 at Houston, Texas.

_____
KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE